UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOHN ROMERO-RODRIGUEZ,

      Petitioner,

v.                              Case No. 8:21-cv-1125-WFJ-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

**ORDER**

John Romero-Rodriguez, a Florida prisoner, timely filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 12). Mr. Romero-Rodriguez did not file a reply. Upon consideration, the petition is **DENIED**.

## I.    Background

This case arises from Mr. Romero-Rodriguez's participation in a string of residential burglaries in central Florida. The burglaries took place from 2009 to 2011 and had several features in common. Among other similarities, all of the victims were of Indian descent, with a "large majority" having the last name "Patel," and the burglars typically gained entry through rear sliding doors. (*E.g.*, Doc. 12-2, Ex. 5, at 24-25; Doc. 12-2, Ex. 19, at 1540-51).

A break in the case came on March 31, 2011. That morning, John Parker was walking his dog in Palm Harbor. (*Id.*, Ex. 12, at 643). He passed the house of his neighbor,

Jayanti Patel. (*Id.* at 648). Mr. Parker saw three men carrying a safe out of the house and placing it in the back of a silver BMW with a missing gas cap. (*Id.* at 649, 653, 752). After the men drove off, Mr. Parker wrote down the license plate number and called 911. (*Id.* at 651-53). Law enforcement determined that the plate belonged to a silver BMW registered to Mr. Romero-Rodriguez's codefendant, Luis Rodriguez-Gomez. (*Id.* at 802). The discovery of this car was significant. Two weeks earlier, surveillance footage from New Tampa had captured a silver BMW with a missing gas cap in the vicinity of two burglarized houses. (*Id.*, Ex. 5, at 26-27). Both were owned by persons of Indian descent. (*Id.*)

After obtaining a court order, law enforcement placed a GPS tracker on the silver BMW. (*Id.*, Ex. 19, at 1474). On April 8, 2011, police followed the car as it traveled from Tampa to Ocala to Gainesville. (*Id.*, Ex. 13, at 841-45, 869-72). Along the way, the car stopped at several residences owned by persons with the last name "Patel." (*E.g.*, *id.*, Ex. 14, at 893-94). Ultimately, law enforcement observed the car park in front of a house in Gainesville for several minutes. (*Id.*, Ex. 13, at 843-44). After the car drove off, an officer walked to the back of the house and saw that "one side" of a "glass French door[]" had been "shattered, leaving a hole in it big enough for someone [to] have gone through." (*Id.* at 845). The house "belonged to a family [with] the last name of Patel." (*Id.*, Ex. 5, at 78).

Shortly after this burglary, law enforcement stopped the silver BMW and arrested its occupants—Mr. Romero-Rodriguez, Mr. Rodriguez-Gomez, and codefendant David Marin-Monroy. (*Id.*, Ex. 14, at 874, 876-77). Inside the vehicle were two GPS units, gold jewelry, several window punches (a device used to break glass), gloves, a screwdriver, a pry bar, and a list of Gainesville and Ocala addresses of people with the last name "Patel."

(*Id.* at 918, 929-46; *id.*, Ex. 18, at 1302; *id.*, Ex. 19, at 1587, 1596). One of the GPS units was set to the address of the Gainesville house that had just been burglarized. (*Id.*, Ex. 14, at 932). Officers subsequently executed a search warrant at Mr. Marin-Monroy's residence. (*Id.*, Ex. 16, at 1151-52). There, they found a list of addresses for several recent burglary victims with the surname "Patel." (*Id.* at 1152-53; *id.*, Ex. 19, at 1521-22, 1550-51, 1596-97).

Mr. Romero-Rodriguez was ultimately charged with racketeering, conspiracy to commit racketeering, burglary of an unoccupied dwelling, and grand theft. (*Id.*, Ex. 7). Following a jury trial, he was found guilty of all charges except grand theft, of which he was acquitted. (*Id.*, Ex. 24). Mr. Romero-Rodriguez received a total sentence of thirty years in prison. (*Id.*, Ex. 25, at 67). After an unsuccessful direct appeal, *Romero-Rodriguez v. State*, 185 So. 3d 1245 (Fla. 2d DCA 2016), he sought postconviction relief under Florida Rule of Criminal Procedure 3.850, (Doc. 12-3, Ex. 32). The postconviction court summarily denied one claim and granted an evidentiary hearing on the other. (Doc. 12-3, Ex. 36). After the hearing, the court denied the remaining claim in a written order. (*Id.*, Exs. 37, 38). The appellate court affirmed the denial of relief without opinion. *Romero-Rodriguez v. State*, 311 So. 3d 13 (Fla. 2d DCA 2021). This federal habeas petition followed. (Doc. 1).

## II.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief

can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in

4

federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Romero-Rodriguez's convictions and sentences, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

**B.      Ineffective Assistance of Counsel**

Mr. Romero-Rodriguez alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Mr. Romero-Rodriguez must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on

the judgment." *Id*. at 691. To demonstrate prejudice, Mr. Romero-Rodriguez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation and citations omitted); *see also Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim—which is governed by the deferential *Strickland* test—through the lens of AEDPA deference, the resulting standard of review is doubly deferential."). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

## III.   Discussion

### A.    Ground One—Denial of Motion to Suppress

Mr. Romero-Rodriguez contends that the trial court violated his constitutional rights by denying his motion to suppress all evidence obtained as a result of the April 8, 2011 traffic stop in Gainesville. (Doc. 8 at 7-9). In his motion to suppress, Mr. Romero-Rodriguez primarily argued that law enforcement lacked probable cause to stop or arrest

him. (Doc. 12-2, Exs. 3, 4). Following an evidentiary hearing, the trial court denied the motion to suppress in a written order. (*Id.*, Exs. 5, 6). The order did not contain any factual findings or legal conclusions. (*Id.*, Ex. 6). On direct appeal, Mr. Romero-Rodriguez challenged the denial of the suppression motion, arguing that law enforcement lacked probable cause to believe "a felony had occurred" before the stop. (Doc. 12-3, Ex. 27, at 18). The appellate court affirmed without opinion. *Romero-Rodriguez v. State*, 185 So. 3d 1245 (Fla. 2d DCA 2016). In his federal habeas petition, Mr. Romero-Rodriguez reiterates his argument that the stop and arrest were illegal because law enforcement lacked probable cause to believe he had committed a crime. (Doc. 8 at 8-9).

No state court explained the denial of the motion to suppress. Thus, Mr. Romero-Rodriguez must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see also Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1291 (11th Cir. 2021) ("[Petitioner's] Confrontation Clause claim was rejected on the merits by the First District Court of Appeal, and there has been no statement of reasons by any state court for rejecting the claim. Under *Richter*, [petitioner's] burden is to demonstrate that there was no reasonable basis for the decision of the First District Court of Appeal to deny his claim."). He cannot meet his burden.[1]

---

[1] Respondent argues (Doc. 21) that Ground One is barred by *Stone v. Powell*, which held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494 (1976). Because the Court concludes that AEDPA deference applies to the denial of the motion to suppress, it need not consider whether *Stone* bars this claim. *See Mays v. Davenport*, 560 F. App'x 958, 962 (11th Cir. 2014) (declining to address whether habeas petition was "timely," or whether "illegal arrest claim" was "precluded by *Stone*," because petition was "due to be denied on the merits"). In addition, the Court rejects Respondent's argument that Ground One is unexhausted. (Doc. 12 at 9-11). Mr. Romero-Rodriguez raised his claim at both the trial and appellate

Before the April 8, 2011 traffic stop, law enforcement had been investigating a string of residential burglaries targeting persons of Indian descent in central Florida. As the lead detective explained at the suppression hearing, the burglaries followed a "set pattern": the victims were of Indian descent, with most having the last name "Patel," and the burglars usually gained entry through rear sliding doors. (Doc. 12-2, Ex. 5, at 24-25). A burglary fitting that pattern took place in Palm Harbor on March 31, 2011. Using a license plate number provided by a witness, law enforcement located the burglars' car—a silver BMW with a missing gas cap. (*Id.* at 25-26, 28). Two weeks earlier, a car matching that description had been captured on surveillance footage in the vicinity of two additional burglaries in New Tampa, both of which involved victims of Indian descent. (*Id.* at 26-27). Law enforcement ultimately obtained a court order allowing it to place a GPS tracking device on the silver BMW. (*Id.* at 28-29).

On the day of the traffic stop, law enforcement followed the silver BMW as it traveled from Tampa to Ocala to Gainesville. (*Id.* at 40-41). Along the way, the car parked in front of several houses occupied by persons with the last name "Patel." (*E.g.*, *id.* at 50-51). The last stop was a house in Gainesville that "belonged to a family [with] the last name of Patel." (*Id.* at 78). After the car drove off, Officer Thomas McCasland checked the back of the house and discovered that the "glass" on the French door "had been shattered, leaving a significant hole in the door." (*Id.* at 81). Officer McCasland immediately advised other officers that "there was a break [in] and it appeared to be a burglary." (*Id.* at 81-82). Based

---

levels, and he cited the federal constitution in both his motion to suppress and his opening brief on appeal. (Doc. 12-2, Ex. 3, at 1; Doc. 12-3, Ex. 27, at 14).

on that information, law enforcement stopped the silver BMW and arrested its occupants, including Mr. Romero-Rodriguez. (*Id.* at 93).

A reasonable jurist could conclude that law enforcement had probable cause to believe Mr. Romero-Rodriguez had committed burglary. The Fourth Amendment protects "the right to be free from arrest without probable cause." *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018). Probable cause requires only "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Davis v. City of Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023).

Taken as a whole, the information available to law enforcement was "sufficient to cause a person of reasonable caution to believe that" Mr. Romero-Rodriguez had committed burglary.[2] *Gates*, 884 F.3d at 1298. The silver BMW had been linked to several residential burglaries in central Florida involving victims of Indian descent. The suspects in those burglaries typically gained entry through rear sliding doors. The day of the traffic

---

[2] Because the officers "maintained at least a minimal level of communication during their investigation," the Court "look[s] to the collective knowledge of" the officers in determining "whether [the] seizure was justified." *United States v. Andres*, 960 F.3d 1310, 1317 (11th Cir. 2020).

stop, law enforcement followed the car as it stopped at multiple houses occupied by people with the last name "Patel." Shortly before the stop, the car pulled in front of a house owned by a family with the surname "Patel." After parking for several minutes, the car drove off. Law enforcement quickly discovered signs of forced entry consistent with the earlier burglaries—specifically, a "shattered" rear French door. (Doc. 12-2, Ex. 5, at 81). This "physical indication[] of forced entry"—combined with the silver BMW's suspicious activity earlier that day and its connection to other burglaries involving victims of Indian descent—could lead "a police officer to a reasonable belief that a burglary . . . had recently occurred." *State v. Yee*, 177 So. 3d 72, 76 (Fla. 3d DCA 2015); *see also In re Sealed Case 96-3167*, 153 F.3d 759, 764 (D.C. Cir. 1998) ("A forced door or window is a commonly recognized element of probable cause in a burglary case." (collecting cases)); *Anderson v. City of Groveland*, No. 5:15-cv-26-JSM-PRL, 2016 WL 881148, at *6 (M.D. Fla. Mar. 8, 2016) (noting that probable cause "to believe a burglary is being committed" may be based on "physical indication of forced entry, *i.e.*, an open door, broken window, [or] tool marks around a door or window").

Because a reasonable jurist could conclude that law enforcement had probable cause to arrest Mr. Romero-Rodriguez for burglary, the state court did not act unreasonably in denying his motion to suppress. Thus, Ground One is denied.

## B.    Ground Two—Ineffective Assistance During Plea Negotiations

Mr. Romero-Rodriguez contends that trial counsel was ineffective for failing to "adequately represent [him] during plea negotiations." (Doc. 8 at 9). Mr. Romero-Rodriguez allegedly "spoke little to zero English" at the time of his criminal case. (Doc. 1

at 9). According to him, the prosecution initially made a "plea offer of six years." (*Id.*) Yet counsel allegedly failed "to bring a certified Spanish translator to assist [Mr. Romero-Rodriguez] in making the decision about the plea offer." (*Id.*) As a result, he "was not able to accept the six[-]year offer." (Doc. 8 at 12). Mr. Romero-Rodriguez also alleges that, "[i]mmediately prior to trial, the State made a second offer" of an "open plea . . . with a cap of ten years." (*Id.*) Once again, Mr. Romero-Rodriguez was allegedly denied "the chance to make an informed decision on the offer," apparently because a Spanish interpreter was not present during discussions with counsel.[3] (*Id.*) Furthermore, "[d]uring both meetings where offers were disclosed," counsel allegedly failed to "make [Mr. Romero-Rodriguez] aware of the maximum sentence he faced." (*Id.*)

The postconviction court held an evidentiary hearing on this claim. Trial counsel testified that he spoke to Mr. Romero-Rodriguez both "with interpreters" and "without interpreters." (Doc. 12-3, Ex. 37, at 37). Counsel had a "specific recollection" of Mr. Romero-Rodriguez "telling [him] on several occasions [that] he did not need an interpreter." (*Id.*) On one occasion, for example, counsel told Mr. Romero-Rodriguez that he "[didn't] have an interpreter," to which Mr. Romero-Rodriguez responded, "[I]t's okay, I understand." (*Id.* at 39). In short, counsel could not recall any "language barriers" between him and his client. (*Id.* at 57).

Counsel also testified that the prosecution "never made a firm plea offer," although it did propose a sentence "around the bottom of the guidelines"—that is, roughly six-and-

---

[3] A Spanish interpreter translated for Mr. Romero-Rodriguez during the trial. (Doc. 12-2, Exs. 8-23).

a-half years in prison. (*Id.* at 39-40). According to counsel, the prosecution "wanted [Mr. Romero-Rodriguez] to cooperate" as part of any plea deal, which meant "testify[ing] against" his codefendants. (*Id.* at 39). Counsel and Mr. Romero-Rodriguez "discuss[ed] what he was looking at and what the [] prosecutor wanted." (*Id.* at 63). But, counsel explained, Mr. Romero-Rodriguez did not wish to cooperate "at any time," nor would he "admit to something [he claimed he] didn't do." (*Id.* at 39, 44; *see also id.* at 68). Counsel also stated that, on the eve of trial, the prosecution indicated that Mr. Romero-Rodriguez "could plea[d] open" with a "cap at 10 [years]." (*Id.* at 40). Counsel testified that he "believed" a Spanish interpreter was present while he discussed this offer with Mr. Romero-Rodriguez, who ultimately rejected it. (*Id.* at 41, 65).

Finally, counsel stated that he was "able to have an intelligent discussion" with Mr. Romero-Rodriguez about "the maximum penalties for the charges." (*Id.* at 38). In particular, counsel informed Mr. Romero-Rodriguez that he faced a maximum of thirty years in prison for racketeering, thirty years in prison for conspiracy to commit racketeering, and fifteen years in prison for burglary. (*Id.* at 38-39).

Mr. Romero-Rodriguez offered a different version of events at the evidentiary hearing. He testified that (1) he repeatedly told counsel he did not "understand" him and "need[ed]" an interpreter, (2) he never discussed any plea offers with counsel, and (3) he did not know the statutory maximum penalties he faced "if [he] were found guilty." (*Id.* at 15-20).

The postconviction court ultimately rejected Mr. Romero-Rodriguez's ineffective-assistance claim, finding no "deficient performance or prejudice." (*Id.*, Ex. 38, at 7). The

court began by deeming "credible the testimony of [trial counsel] based on his demeanor in the courtroom." (*Id.*) By contrast, the court rejected Mr. Romero-Rodriguez's testimony as "incredible" "based on [his] demeanor and the content of his" statements. (*Id.*) For example, the court noted that Mr. Romero-Rodriguez's "testimony at the evidentiary hearing was inconsistent with the sworn allegations in his motion." (*Id.*) Specifically, Mr. Romero-Rodriguez "alleged in his motion that [counsel] relayed the initial offer during one of their meetings, but an interpreter was not present so he did not want to accept it without fully understanding it." (*Id.*) "At the evidentiary hearing," however, he "testified he never discussed an offer with" counsel. (*Id.*)

Based on these credibility determinations, the court found that "counsel discussed with [Mr. Romero-Rodriguez] the State's initial offer of a bottom-of-the-guidelines sentence and the State's second offer [] of an open plea with a ten-year cap." (*Id.*) The court also determined that counsel "advised [Mr. Romero-Rodriguez] of the maximum penalty he faced." (*Id.* at 8). Additionally, the court found that counsel was "able to communicate with [Mr. Romero-Rodriguez] in English without interpreters." (*Id.*) Thus, the court concluded, "counsel effectively communicated the State's offers to [Mr. Romero-Rodriguez] and advised [him] of the maximum sentence he faced." (*Id.*) As a result, Mr. Romero-Rodriguez failed to "establish[] deficient performance." (*Id.*)

The court also found that Mr. Romero-Rodriguez "ha[d] not established prejudice." (*Id.*) It based that conclusion on counsel's testimony that Mr. Romero-Rodriguez "did not want to enter a plea because he did not commit the crimes charged and because he did not want to cooperate with the State." (*Id.*)

13

The rejection of this claim was reasonable. As an initial matter, the court credited counsel's version of events and declined to give any weight to Mr. Romero-Rodriguez's testimony. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Mr. Romero-Rodriguez has not shown by "clear and convincing evidence" that the court's credibility determinations were erroneous. 28 U.S.C. § 2254(e)(1). To the contrary, the court accurately summarized the testimony from the evidentiary hearing and carefully explained the weight it gave to each witness's statements. Thus, its credibility determinations are entitled to deference. *See Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("Federal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

Having credited counsel's testimony, the postconviction court reasonably rejected the ineffective-assistance claim. "[C]laims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*." *Missouri v. Frye*, 566 U.S. 134, 140 (2012). Counsel's performance "is deficient only if it falls below the wide range of competence demanded of lawyers in criminal cases." *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014). To establish prejudice in the context of a failed plea bargain, the petitioner must show that, "but for the ineffective assistance of counsel, a reasonable probability existed that: (1) the plea offer would have been presented to the court (*i.e.* the [petitioner] would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances); (2) the court would have accepted its

14

terms; and (3) under the offer's terms, the conviction or sentence, or both, would have been less severe than under the judgment and sentence that were, in fact, imposed." *Carmichael v. United States*, 966 F.3d 1250, 1259 (11th Cir. 2020).

The postconviction court reasonably concluded that counsel did not render ineffective assistance. Counsel testified that he discussed the plea offers and the maximum penalty with Mr. Romero-Rodriguez. (Doc. 12-3, Ex. 37, at 38-49, 41, 63). Counsel also stated that he could not recall any "language barriers" between him and his client. (*Id.* at 57). Indeed, he specifically recalled Romero-Rodriguez "telling [him] on several occasions [that] he did not need an interpreter." (*Id.* at 37). Based on this testimony, the postconviction court found that "counsel effectively communicated the State's offers to [Mr. Romero-Rodriguez] and advised [him] of the maximum sentence he faced." (*Id.*, Ex. 38, at 8). In these circumstances, "[r]easonable jurists could agree" that counsel's performance "was within the range of competent representation." *Pineda v. Warden, Calhoun State Prison*, 802 F.3d 1198, 1203 (11th Cir. 2015).

The postconviction court likewise acted reasonably in finding no prejudice. As noted above, prejudice requires a showing that, but for counsel's allegedly deficient performance, Mr. Romero-Rodriguez "would have accepted a guilty plea and would not have insisted on going to trial." *Rosin v. United States*, 786 F.3d 873, 878 (11th Cir. 2015). Here, counsel testified that the prosecution "wanted [Mr. Romero-Rodriguez] to cooperate" as part of any plea deal, but Mr. Romero-Rodriguez did not wish to cooperate "at any time," nor would he "admit to something [he claimed he] didn't do." (Doc. 12-3, Ex. 37, at 39, 44; *see also* Doc. 12-3, Ex. 37, at 68). Based on this testimony, the

postconviction court found that Mr. Romero-Rodriguez was not prejudiced because, regardless of counsel's performance, he would not have accepted a plea deal. (*Id.*, Ex. 38, at 8). That conclusion was reasonable. *See Osley v. United States*, 751 F.3d 1214, 1224 (11th Cir. 2014) ("While [defendant's] denial of guilt surely is not dispositive on the question of whether he would have accepted the government's plea offer, it is nonetheless a relevant consideration."); *Castillo v. Dixon*, No. 20-61958-CIV, 2023 WL 6376739, at *5 (S.D. Fla. Aug. 24, 2023) ("[T]he record supports the court's conclusion that Petitioner suffered no prejudice, as he would not have accepted the plea agreement requiring cooperation even had he been fully informed."), *adopted by* 2023 WL 6376505 (S.D. Fla. Sept. 30, 2023); *Adams v. United States*, No. 5:20-cv-08008-RDP, 2023 WL 2543082, at *3 (N.D. Ala. Mar. 16, 2023) ("Because any plea offer would have required Petitioner's cooperation, and because he adamantly refused to cooperate from the early stages of the case, Petitioner cannot show that he was prejudiced by his counsel's alleged failure to negotiate or present him with a plea.").

For all these reasons, Ground Two is denied.

## C.      Ground Three—Ineffective Assistance Concerning Motion to Sever

Lastly, Mr. Romero-Rodriguez contends that trial counsel was ineffective for "failing to file a motion to sever his case from his codefendants in a timely and effective manner." (Doc. 1 at 12). The day before trial began, counsel received an English translation of a post-arrest interview with Mr. Rodriguez-Gomez—one of Mr. Romero-Rodriguez's codefendants. (*Id.*; *see also* Doc. 12-2, Ex. 8, at 8). During the interview, Mr. Rodriguez-Gomez told law enforcement that Mr. Romero-Rodriguez "was not with him" during the

16

other burglaries. (Doc. 1 at 12). In other words, according to this statement, Mr. Romero-Rodriguez's presence in Gainesville on April 8, 2011, was "a one[-]time thing." (Doc. 12-2, Ex. 8, at 6). On the first day of trial, counsel for Mr. Romero-Rodriguez moved to sever the case, arguing that he would not be able to "use" the codefendant's exculpatory statement at a joint trial. (*Id.* at 7). The court rejected the request for severance, finding an insufficient "basis at this time to grant the motion." (*Id.* at 11).

Counsel renewed the motion to sever at the conclusion of the State's case. (*Id.*, Ex. 21, at 1711-12). He explained that, although he wished to call Mr. Rodriguez-Gomez "to the stand," he "believe[d]" Mr. Rodriguez-Gomez would refuse to testify. (*Id.* at 1712). Counsel therefore sought to "preserve the fact that had this case been severed I would have been able to subpoena [Mr. Rodriguez-Gomez], but I cannot compel him to testify against himself." (*Id.*) The court denied the renewed motion, explaining that it would "not sever[] the counts." (*Id.*)

In his federal habeas petition, Mr. Romero-Rodriguez argues that counsel "should have [filed] a motion to sever long before trial so the exculpatory evidence could have been admitted." (Doc. 1 at 13). He contends that severance was necessary because "the only way to question Mr. Rodriguez-Gomez about his prior statement would be to subpoena him as a witness and call him during the [d]efense's case" at a separate trial for Mr. Romero-Rodriguez. (*Id.*)

The postconviction court rejected this claim, finding that Mr. Romero-Rodriguez "failed to prove that defense counsel acted deficiently or that he was prejudiced." (Doc. 12-3, Ex. 36, at 9). The court explained that counsel "did move to sever [Mr. Romero-

Rodriguez's] case from [Mr.] Rodriguez-Gomez's case and later renewed his request, and the record reflect[ed] that both requests were denied by the trial court due to an insufficient basis." (*Id.*)

The postconviction court reasonably rejected this claim for lack of prejudice.[4] To show prejudice in this context, Mr. Romero-Rodriguez must establish a reasonable probability that a motion to sever would have been granted. *See Delva v. United States*, 851 F. App'x 148, 153 (11th Cir. 2021) (finding no prejudice from failure to seek severance because there was no "reasonable probability" that "a motion to sever [would] have succeeded"). "To obtain a severed trial based on a defendant's desire to offer a codefendant's potentially exculpatory testimony, the defendant must show: (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature and effect, and (4) that the codefendant will in fact testify if the cases are severed." *Daniels v. State*, 634 So. 2d 187, 192 (Fla. 3d DCA 1994).

Mr. Romero-Rodriguez fails to establish a reasonable probability that a "timely and effective" motion to sever would have succeeded. That is because he presents no evidence that his codefendant—Mr. Rodriguez-Gomez—would have been willing to "testify if the cases [had been] severed." *Id.* Mr. Rodriguez-Gomez's post-arrest statement was clearly self-incriminating; it contained an admission that he had participated in several burglaries. Thus, had he been called to testify at a separate trial, Mr. Rodriguez-Gomez could have

---

[4] Because the postconviction court reasonably found no prejudice, this Court need not address *Strickland*'s performance prong. *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[A] court need not address the performance prong of [*Strickland*] if the defendant cannot meet the prejudice prong, or vice versa.").

invoked his Fifth Amendment right against self-incrimination. *See United States v. Ahmed*, 73 F.4th 1363, 1380 (11th Cir. 2023) (noting that "[a] witness properly invokes [the Fifth Amendment] privilege when reasonably apprehend[ing] a risk of self-incrimination" (internal quotation marks and citation omitted)). There is simply no evidence that Mr. Rodriguez-Gomez would have been willing to waive that privilege at a separate trial. *Cf. Taylor v. Singletary*, 122 F.3d 1390, 1393 (11th Cir. 1997) ("[Petitioner] clearly stated his intention and desire to call Ortiz as a defense witness, and Ortiz clearly indicated his willingness, through a signed affidavit and otherwise, to provide exculpatory evidence on [Petitioner's] behalf after the conclusion of his own trial."). And without such evidence, there is no basis to conclude that a motion to sever would have succeeded.[5] *See United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (holding that trial court properly denied motion to sever where defendant alleged only that codefendant "might have elected to testify" at separate trial).

To be sure, Mr. Romero-Rodriguez had "a Sixth Amendment right to compulsory process to obtain favorable testimony." *United States v. King*, 623 F. App'x 962, 967 (11th Cir. 2015). But his codefendant's "valid assertion of [his] Fifth Amendment rights" would have "justifie[d] a refusal to testify despite [Mr. Romero-Rodriguez's] Sixth Amendment rights." *Id.* (internal quotation marks and citation omitted); *see also Martin v. Sec'y, Fla. Dep't of Corr.*, No. 2:11-cv-639-SPC-CM, 2014 WL 5018643, at *9 (M.D. Fla. Oct. 7,

---

[5] Even if Mr. Rodriguez-Gomez had been tried first, "he would still [have been] entitled to invoke his Fifth Amendment privilege if he were called to testify at [Mr. Romero-Rodriguez's] subsequent trial." *United States v. Triumph Cap. Grp., Inc.*, 260 F. Supp. 2d 432, 443 (D. Conn. 2002). "This would be particularly true if [Mr. Rodriguez-Gomez] were convicted in a[n] earlier trial and had a motion or appeal pending that challenged his conviction and could result in a new trial." *Id.*

19

2014) ("[T]he Sixth Amendment's right of compulsory process must generally give way to a witness'[s] Fifth Amendment privilege against self-incrimination.").

In short, Mr. Romero-Rodriguez fails to demonstrate a reasonable probability that a motion to sever would have been granted. Thus, he cannot show prejudice from counsel's handling of the severance issue, and Ground Three is denied.

## IV.   Conclusion

Accordingly, the Court **ORDERS**:

1.  Mr. Romero-Rodriguez's petition (Doc. 1) is **DENIED**.

2.  The **CLERK** is directed to enter judgment against Mr. Romero-Rodriguez and to **CLOSE** this case.

3.  Mr. Romero-Rodriguez is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Romero-Rodriguez must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Romero-Rodriguez has not made the requisite showing. Because Mr. Romero-Rodriguez is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on June 5, 2024.

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**